388 So.2d 1250 (1980)
Scott William LAWRENCE and Charles Axonowitz, Appellants,
v.
STATE of Florida, Appellee.
Nos. 78-1085, 78-1089.
District Court of Appeal of Florida, Fourth District.
September 10, 1980.
Rehearing Denied November 12, 1980.
*1251 J. David Bogenschutz of Varon & Stahl, Hollywood, for appellants.
Jim Smith, Atty. Gen., Tallahassee, and Max Rudmann and Charles W. Musgrove, Asst. Attys. Gen., West Palm Beach, for appellee.
DOWNEY, Judge.
Appellants were charged in four counts with narcotics offenses. Upon denial of their motion to suppress appellants pleaded nolo contendere to one count, reserving the right to question on appeal the denial of the motion to suppress.
On October 5, 1977, Officer Puleo, a narcotics undercover agent with the Fort Lauderdale Police Department, met with appellant Scott Lawrence at 1901 North East 15th Avenue, Fort Lauderdale, to negotiate for the purchase of a large amount of cocaine and marijuana. That meeting lead to further contacts the following day. On October 6, 1977, Puleo received an anonymous phone call directing him to 2429 Castilla Isle, Fort Lauderdale, where he could purchase approximately two pounds of cocaine. After confirming the street directions with Lawrence, Puleo proceeded to the specified address along with Officer Ortenzo, another undercover agent.
The officers were met in the front of the house by appellant Lawrence and another man named Griffin. The officers were told to go the boat house which was to the rear of the main residence and there they met appellant Chuck Axonowitz. The group was awaiting the arrival of "Mark" who allegedly had the "stuff." While waiting, Lawrence produced some cocaine from the kitchen area, placed it on the counter top, divided it into lines and passed it around for the group's personal use. After this diversion, dinner was served, followed by the sharing of marijuana cigarettes. Meanwhile, several other people arrived at the scene, one of whom was Felix Lebel. Shortly, thereafter, Axonowitz left with Lebel saying he was going to "Mark's" house to get the cocaine.
At approximately 12:45 a.m., Axonowitz returned and told the officers to come up to the main house. Puleo, Ortenzo, Lawrence, and Axonowitz went into the main bedroom to conduct the transaction. Axonowitz told the officers he was unable to provide them with more than fifteen ounces of cocaine at *1252 that time, but that he was certain the remainder would be forthcoming the next day. Axonowitz then handed Puleo a brown bag containing a white powdered substance, which later proved to be cocaine. As Puleo weighed the cocaine, he asked Lawrence if there was any way to make the fifteen ounces an even pound. Lawrence left the room momentarily and returned with a box and scale. Lawrence said the box contained three more ounces of cocaine and he handed it over for the officers' inspection. Puleo agreed to buy one more ounce and handed the remaining two ounces back to Lawrence, who placed it back in the box.
While Puleo was completing the details of the purchase, Ortenzo left the premises purportedly to get another scale and the money. Ortenzo reentered the house with several back-up officers who were waiting outside. Whereupon Puleo took custody of appellants. Ortenzo took possession of the cocaine immediately after the arrest. The drugs were on the table some two feet in front of where Puleo had transacted the purchase.
Appellants pose the following question as their sole point on appeal:
Did not the trial court err in denying the defendant's motion to suppress evidence to wit: cocaine, seized pursuant to a warrantless search of a dwelling, wherein there was no affirmative showing of exigency, consent or any other exception to the search warrant requirement, and if so, should not the trial court's order of denial be reversed?
The authorities relied upon by appellants for requiring search warrants or arrest warrants prior to entry are simply not applicable here because of the factual setting presented. On the contrary, this case is factually very close to one of our earlier cases, State v. Yenke, 288 So.2d 531 (Fla.4th DCA 1974). We have the consensual entry of the undercover officers, the negotiations for the sale of contraband, the presence of the contraband, the actual possession thereof by Puleo while weighing it. In the Yenke case it was unclear whether Officer Bower had manual possession of the twenty pounds of marijuana Yenke had delivered to him. In the present case Officer Puleo did not have manual possession of the contraband when Ortenzo reentered the house; the contraband was on the table where Puleo had weighed it; and Puleo was right there so that the contraband was at least in his constructive possession. We hold that the actual physical possession of the contraband is not a prerequisite to the admissibility of the 16 ounces of cocaine as evidence under the circumstances of this case; this court's decision in State v. Farrington, 338 So.2d 81 (Fla. 4th DCA 1976), does not require a contrary holding.
Furthermore, we hold, as we did concerning Officer Riffle in Yenke, that Ortenzo had implied consent to reenter the house. Appellants were attempting to sell contraband; the deal had been agreed upon; and Ortenzo ostensibly went outside to get the money. Obviously, appellants wanted him to return to complete the deal. Thus, to require him to knock and announce would be an absurd legalistic construction of the knock and announce statute. To the extent State v. Collier, 270 So.2d 451 (Fla.4th DCA 1972), holds to the contrary, we recede from it. In addition, the facts of the present case are different from those of Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). There none of the officers who effectuated the arrests was inside the dwellings where the arrests took place.
Appellants further urge reversal on the grounds that the police had two mandatory alternatives available to them in handling this investigation leading up to the arrest. First, appellants suggest the police should have had a judge standing by to issue a search warrant. Upon learning facts sufficient to constitute probable cause, the police on the scene could have communicated that information to an affiant so as to obtain a search warrant. Alternatively, appellants suggest that after Puleo received delivery of the cocaine, he and Ortenzo should have left the residence and gone to a magistrate to obtain a search warrant. Surveillance could have been maintained on the house to prevent anyone from leaving and jeopardizing the money and other evidence *1253 from being lost. Appellants rely upon Raffield v. State, 351 So.2d 945 (Fla. 1977), Hornblower v. State, 351 So.2d 716 (Fla. 1977), and Hannigan v. State, 307 So.2d 850 (Fla. 1st DCA 1975), to support the foregoing contention. The Raffield holding concerning use of the first suggested procedure arose from a factual setting clearly distinguishable from that in the case at bar. In Raffield government agents stopped three heavily laden vehicles in Tallahassee three hours after those vehicles had been driven away from Raffield's 40 acre farm. A search of the vehicles disclosed each contained marijuana and led to the arrest of the drivers. Armed with that information, the obtaining of a search warrant was in order before law enforcement officers proceeded to search the farm three hours after the vehicle searches. Moreover, neither Raffield, Hornblower, nor Hannigan has the factual situation where the officers are properly inside the house viewing the contraband which is for sale. We think that fact distinguishes this case and Yenke from Raffield, Hornblower, and Hannigan. Similarly, two other cases appellants rely on for reversal are dissimilar to the present case. In Hansen v. State, 372 So.2d 1003 (Fla.4th DCA 1979), the contraband was seized by officers who failed to knock and to announce their purpose before entering the premises upon which the contraband was located; there was no delivery of the contraband to either of two undercover officers already present on the premises.
State v. Roman, 309 So.2d 12 (Fla.4th DCA 1975), differs from Yenke and from the present case in one crucial aspect, namely, after the defendant had delivered the contraband to Beckstrom, Beckstrom left the premises, thereby permitting an inference that he abandoned possession of the contraband. In both Yenke and this case the officer to whom the contraband was delivered retained either actual or constructive possession thereof.
In view of the foregoing, the judgments and sentences appealed from are affirmed.
The foregoing decision passes upon the following questions, which we hereby certify are of great public importance:
(1) When an individual invites more than one undercover law enforcement officer into a dwelling or other building in order to transact felonious business and one officer leaves the premises on the pretext of furthering the felonious transaction (but in reality to obtain reinforcements) while another officer or officers remain inside the premises, does the officer who left have an implied invitation to reenter the premises freely or must he comply with the provisions of Section 901.19(1), Florida Statutes (1979), in order to make a lawful reentry?
(2) Does the holding of the Supreme Court of the United States in Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), prohibit the sort of reentry described in question (1) even though the officer seeking reentry complies with Section 901.19(1)?
DOWNEY and MOORE, JJ., concur.
ANSTEAD, J., concurs specially with opinion.
ANSTEAD, Judge, specially concurring:
I agree completely with Judge Downey's opinion. This court has had substantial difficulty reconciling several previous decisions we have rendered involving similar factual situations. See Hansen v. State, 372 So.2d 1003 (Fla.4th DCA 1979). In my view once the defendants admitted the undercover police officers to their premises and proceeded to openly engage in criminal conduct in the officers' presence they could not thereafter claim any violation of their reasonable expectation of privacy under the Fourth Amendment if one of the officers left and returned, alone or with other officers, and effected their arrest. Under such circumstances the defendants have waived any privacy claim by disclosing the contraband and engaging in criminal conduct in the presence of the officers, who could have effected the arrest of the defendants inside the premises at any time. The fact that one officer left and returned on a ruse may have benefited the officers by allowing them the added protection of other armed *1254 officers to assist in the arrest, but such conduct did not constitute an additional intrusion into the defendants' premises since such intrusion had already been lawfully accomplished by the undercover officers. I think the officers' conduct in this case was eminently reasonable and would recede from any implication to the contrary contained in Hansen v. State, supra, and the cases cited therein. Also see Koptyra v. State, 172 So.2d 628 (Fla.2d DCA 1965).